**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**Case No.  18-cv-63035-BLOOM/Valle**

ERIC WATKINS,

      Plaintiff,

vs.

SERGEANT M. BIGWOOD, *et al.*,

      Defendants.

_____/

## OMNIBUS ORDER

**THIS CAUSE** is before the Court upon Defendants', Sergeant M. Bigwood ("Bigwood"), Officer T. Yopps ("Yopps"), and Officer Samuel Ramos ("Ramos") (collectively, "Defendants"), Motion to Dismiss, ECF No. [40] ("Motion"). Plaintiff filed his Response, ECF No. [43] ("Response"), to which Defendants filed their Reply, ECF No. [46] ("Reply"). The Court has considered the Motion, the Response, the Reply, the record in this case, the applicable law, and is otherwise fully advised. For the reasons set forth below, the Motion is denied. Plaintiff's Motion for Leave, ECF No. [47], to file a sur-reply is denied as moot.

### I.      BACKGROUND

On March 11, 2020, the Court granted in part and denied in part Defendants' motion to dismiss and motion for more definite statement. *See* ECF No. [30] ("Order"). Specifically, the Court dismissed the official capacity claims against Defendants without prejudice and required Plaintiff to file an amended complaint that comports with Rules 8 and 10, Fed. R. Civ. P. *See id.* On March 19, 2020, Plaintiff filed the operative Amended Complaint, ECF No. [35] ("Complaint"), in which he brings two counts against Defendants under 42 U.S.C. § 1983 based on alleged First and Fourth Amendment violations. Unlike the original complaint, ECF No. [1],

the instant Complaint raises claims against Defendants only in their individual capacities. *See* ECF No. [35] at ¶¶ 3-5.

This action arises out of Plaintiff's involuntary detention for a mental health evaluation after joggers in a public park complained to Defendants about Plaintiff's alleged behavior—brandishing a knife and shouting anti-gay slurs—while in the park. *See generally* ECF No. [35]. Plaintiff alleges that he is homeless and lives out of his car. *Id.* at ¶ 22. He alleges that on December 15, 2014, he was sitting outside his car in Mullins Park while preparing to make breakfast, and he was singing an anti-gay reggae song.[1] *Id.* at ¶¶ 10, 21. According to him, this had been his "routine for more than a year prior." *Id.* at ¶ 11. He was situated approximately 60 feet away from the walkway where patrons walk or exercise. *Id.* at ¶ 10. He asserts that two joggers, Tanika Beckford ("Beckford") and Jermaine Jackson ("Jackson"), were offended by Plaintiff's singing. *Id.* at ¶ 12. He alleges that Jackson believed that Plaintiff was speaking to him, but he ignored Jackson and continued to sing. *Id.* at ¶ 14. Jackson, in response, allegedly cursed at him and attempted to physically attack Plaintiff but was restrained by Beckford, and they walked out of the park while Plaintiff continued singing. *Id.* at ¶¶ 14-16, 21. According to Plaintiff, Beckford and Jackson told him that they were going to call the police and have him arrested for singing the anti-gay song. *Id.* at ¶ 17.

Sometime later, Officers Ramos and Manchula[2] arrived on the scene. Ramos informed Plaintiff that the police were called in response to a complaint that he was "in the park disturbing the peace." *Id.* at ¶ 18. Plaintiff alleges that, in a "calm cool and collected manner," he informed

---

[1] The song's lyrics included references to shooting homosexuals, and it included derogatory terms such as "faggot" and "batty boy." *See id.* at ¶¶ 21, 26

[2] Officer Manchula is not named as a defendant. Plaintiff alleges that he "had a history with" Officer Manchula. *See id.* at ¶ 18.

Ramos that he was not creating a disturbance but that he was "merely singing a song Boom Bye Bye in a faggot boy head and the two patrons got upset and started cursing" at him. *Id.* at ¶ 19. Bigwood later arrived, and he informed Plaintiff that Beckford and Jackson had complained that he had been making anti-gay slurs while waiving a knife in his hand. *Id.* at ¶ 20. Plaintiff told Bigwood that he possessed two knives, which he uses to prepare his meals, but he denied having the knives out while he was singing because he had yet to prepare breakfast. *Id.* at ¶¶ 22-24. In response to Bigwood's question about how Beckford would know that he had a knife, Plaintiff informed him that everyday he is "in the park with [his] desk outside [his] car and that [he is] either doing writing or preparing [his] meals." *Id.* at ¶ 25.

After Bigwood had listened to Plaintiff sing the song and had spoken with Beckford and Jackson, Bigwood reportedly informed Plaintiff that he believed Plaintiff needed a mental health examination based upon the incident at hand and a previous incident eight months earlier in April 2014 at another park. *Id.* at ¶¶ 26-27. Plaintiff alleges that that previous incident involved "a park manager wanting to officially trespass [Plaintiff] from the park" and that Officer Manchula had been involved in that incident. *Id.* at ¶¶ 28-29. He also alleges that that incident did not involve complaints from patrons that he was shouting anti-gay slurs. *Id.* at ¶ 43. After speaking with Officer Manchula, Bigwood allegedly again told Plaintiff that he believed that he needed a mental evaluation because of his "constant singing of the antigay song in parks" and because he believed that Plaintiff had waived his knife at Beckford. *Id.* at ¶ 30. According to Plaintiff, Bigwood asked him to voluntarily submit himself to a mental health examination, but he refused to go. *Id.* at ¶¶ 32-33.

The Complaint asserts that Bigwood, in response, ordered Ramos and Yopps to arrest him,

and he was handcuffed, placed in a police car, had his phone confiscated,[3] and was taken to a "mental facility." *Id.* at ¶¶ 34-35. Plaintiff alleges that he was not confrontational with the police, and Beckford and Jackson's reports to the police were unreliable and not provided in a sworn affidavit. *Id.* at ¶¶ 36-37. According to Plaintiff, Beckford and Jackson made various false statements to police, such as Plaintiff shouting anti-gay slurs at Jackson, appearing hostile and preparing to physically engage Jackson, and stabbing the air toward Jackson with a knife. *Id.* at ¶¶ 37, 39-40. He never told Bigwood that he hated homosexuals and never shouted anti-gay slurs. *Id.* at ¶ 41.

Plaintiff's behavior never varied from calm to angry, and he never expressed feelings of conspiracy that random citizens and police were targeting him without cause, which Bigwood reported. *See id.* at ¶ 42. He also never told Bigwood that he was "not Fucking going anywhere." *Id.* at ¶ 44. According to Plaintiff, prior to December 15, 2014, no mental health professional had certified that he met the criteria for involuntary examination. *Id.* at ¶ 45. He further alleges that during his conversation with Bigwood, he expressed that Bigwood's decision to arrest him under the Baker Act was a "conspiracy between Bigwood and the other officers, especially Manchula, and the complainants, but specifically the officers because of Plaintiff's past and present pending lawsuits against Lauderhill police officers, especially Manchula who Plaintiff had a pending lawsuit against," and that the decision to arrest him was "to retaliate against Plaintiff to cause him mental anguish and hardship and to disrupt and hinder Plaintiff from timely filing a response in court in the case against Manchula[.]" *Id.* at ¶ 46.

Plaintiff alleges that as a result of being Baker Acted "coupled with the false statements in

---

[3] Plaintiff alleges that he was video recording the entire incident on his cell phone, but that when he was released from the medical facility, the video was deleted from his phone, and only Officers Ramos and Manchula knew that he was recording the incident. *Id.* at ¶¶ 34, 38.

the arrest records," he is seen as a "trouble maker and mental problem and case," and he cannot get employment. *Id.* at ¶ 50. The Complaint seeks $1,000,000.00 in compensatory damages from each Defendant and $2,000,000.00 in punitive damages from each Defendant. *Id.* at ¶¶ 52-53.

Defendants now move to dismiss the Complaint with prejudice based on qualified immunity. ECF No. [40]. They assert that regarding the Fourth Amendment claim (Count I), the allegations demonstrate that they were acting within their discretionary authority, there are insufficient factual allegations against Yopps and Ramos, and that the facts as pled do not show that Bigwood involuntarily detained Plaintiff without probable cause. *Id.* at 2. Regarding the First Amendment claim (Count II), Defendants assert that based on recent Eleventh Circuit precedent involving Plaintiff in a different lawsuit, it was not clearly established law that it was not appropriate to apprehend Plaintiff for singing the same anti-gay song at issue in this case. *Id.* (citing *Watkins v. Central Broward Regional Park*, 799 F. App'x 659 (11th Cir. 2020) ("*Watkins II*")).[4]

Plaintiff responds that *Watkins I* did not indicate whether the dismissal of the complaint against the Lauderhill Police Department was with or without prejudice, and that Defendants mischaracterize the *Watkins I* decision. ECF No. [43]. He further argues that Defendants are not entitled to qualified immunity regarding either count under the factual allegations as pled in the Complaint. *Id.* Additionally, he argues that he should be allowed to amend his complaint to assert additional facts that he believes would further establish liability against Officers Yopps and Ramos. *Id.*

In their Reply, Defendants argue that Plaintiff does not dispute that Defendants acted within their discretionary authority, and that he fails to carry his burden to establish that qualified

---

[4] The Eleventh Circuit's decision affirming in part and reversing in part this Court's initial *sua sponte* dismissal order, *see Watkins v. Bigwood*, No. 19-10456, 2019 WL 6724401 (11th Cir. Dec. 19, 2019), is referred to as "*Watkins I*."

immunity does not apply regarding either count. ECF No [46]. Additionally, Defendants assert that Plaintiff relies on facts concerning Officers Ramos and Yopps that were not pled in the Amended Complaint, and that it is improper to request leave to amend in a response to a motion to dismiss. *See id.* at 2.

The Motion, accordingly, is ripe for consideration.

## II.     LEGAL STANDARDS

### A.     Motion to dismiss

A pleading in a civil action must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Although a complaint "does not need detailed factual allegations," it must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *see Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (explaining that Rule 8(a)(2)'s pleading standard "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation"). Nor can a complaint rest on "'naked assertion[s]' devoid of 'further factual enhancement.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557 (alteration in original)).

When reviewing a motion under Rule 12(b)(6), a court, as a general rule, must accept the plaintiff's allegations as true and evaluate all plausible inferences derived from those facts in favor of the plaintiff. *See Miccosukee Tribe of Indians of Fla. v. S. Everglades Restoration Alliance*, 304 F.3d 1076, 1084 (11th Cir. 2002); *AXA Equitable Life Ins. Co. v. Infinity Fin. Grp., LLC*, 608 F. Supp. 2d 1349, 1353 (S.D. Fla. 2009). However, this tenet does not apply to legal conclusions, and courts "are not bound to accept as true a legal conclusion couched as a factual allegation." *Twombly*, 550 U.S. at 555; *see Iqbal*, 556 U.S. at 678; *Thaeter v. Palm Beach Cty. Sheriff's Office*, 449 F.3d 1342, 1352 (11th Cir. 2006). Moreover, "courts may infer from the

factual allegations in the complaint 'obvious alternative explanations,' which suggest lawful conduct rather than the unlawful conduct the plaintiff would ask the court to infer." *Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1290 (11th Cir. 2010) (quoting *Iqbal*, 556 U.S. at 682).

A court considering a Rule 12(b) motion is generally limited to the facts contained in the complaint and attached exhibits, including documents referred to in the complaint that are central to the claim. *See Wilchombe v. TeeVee Toons, Inc.*, 555 F.3d 949, 959 (11th Cir. 2009); *Maxcess, Inc. v. Lucent Techs., Inc.*, 433 F.3d 1337, 1340 (11th Cir. 2005) ("[A] document outside the four corners of the complaint may still be considered if it is central to the plaintiff's claims and is undisputed in terms of authenticity.") (citing *Horsley v. Feldt*, 304 F.3d 1125, 1135 (11th Cir. 2002)).

### B.   *Pro se* litigants

"*Pro se* pleadings are held to a less stringent standard than pleadings drafted by attorneys and will, therefore, be liberally construed." *Tannenbaum v. United States*, 148 F.3d 1262, 1263 (11th Cir. 1998). This leniency, however, does not confer on *pro se* litigants "a right to receive special advantages not bestowed on other litigants. [The *pro se* litigant] must, for example, abide by local rules governing the proper form of pleadings." *Procup v. Strickland*, 760 F.2d 1107, 1115 (11th Cir. 1985). Further, courts cannot serve as *de facto* counsel for a party and cannot rewrite a deficient pleading for the sake of sustaining an action. *Jarzynka v. St. Thomas Univ. of Law*, 310 F. Supp. 2d 1256, 1264 (S.D. Fla. 2004). The Court cannot simply "fill in the blanks" to infer a claim, *Brinson v. Colon*, 2012 WL 1028878, at *1 (S.D. Ga. Mar. 26, 2012), as "it is not the Court's duty to search through a plaintiff's filings to find or construct a pleading that satisfies Rule 8," *Sanders v. United States*, 2009 WL 1241636, at *3 (N.D. Ga. Jan. 22, 2009); *see Bivens v. Roberts*, 2009 WL 411527, at *3 (S.D. Ga. Feb. 18, 2009) ("[J]udges must not raise issues and

arguments on plaintiffs' behalf, but may only construe pleadings liberally given the linguistic imprecision that untrained legal minds sometimes employ." (citing *Miller v. Donald*, 541 F.3d 1091, 1100 (11th Cir. 2008))). In determining whether a *pro se* litigant has stated a claim, "the court ought not penalize the litigant for linguistic imprecision in the more plausible allegations," while keeping in mind that "wildly implausible allegations in the complaint should not be taken to be true." *Miller*, 541 F.3d at 1100.

## III.    DISCUSSION

Determining whether the Complaint should be dismissed raises the overarching issues as to whether Defendants are entitled to qualified immunity under Count I and Count II. The Court will address each issue in turn.

### A.    Qualified immunity defense generally

"Qualified immunity offers complete protection for government officials sued in their individual capacities if their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Kingsland v. City of Miami*, 382 F.3d 1220, 1231 (11th Cir. 2004) (quoting *Vinyard v. Wilson*, 311 F.3d 1340, 1346 (11th Cir. 2002)); *see also Storck v. City of Coral Springs*, 354 F.3d 1307, 1313 (11th Cir. 2003). "The purpose of this immunity is to allow government officials to carry out their discretionary duties without the fear of personal liability or harassing litigation, protecting from suit all but the plainly incompetent or one who is knowingly violating the federal law," *Wood v. Kesler*, 323 F.3d 872, 877 (11th Cir. 2003) (quoting *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002)). The qualified immunity doctrine accordingly represents "a balance between the need for a remedy to protect citizens' rights and the need for government officials to perform their duties without the

fear of constant, baseless litigation." *Kingsland*, 382 F.3d at 1231 (citation omitted). Accordingly, "[q]ualified immunity is, as the term implies, qualified. It is not absolute." *Id.* at 1233.

"Generally speaking, it is proper to grant a motion to dismiss on qualified immunity grounds when the 'complaint fails to allege the violation of a clearly established constitutional right.'" *Corbitt v. Vickers*, 929 F.3d 1304, 1311 (11th Cir. 2019) (quoting *St. George v. Pinellas Cty.*, 285 F.3d 1334, 1337 (11th Cir. 2002)). To prevail on a motion to dismiss based on qualified immunity, "the public official must first prove that he was acting within the scope of his discretionary authority when the allegedly unconstitutional acts took place." *Storck*, 354 F.3d at 1314 (citing *Courson v. McMillian*, 939 F.2d 1479, 1487 (11th Cir. 1991)).

"A government official acts within his discretionary authority if his actions were (1) undertaken pursuant to the performance of his duties; and (2) within the scope of his authority." *Mikko v. City of Atlanta, Ga.*, 857 F.3d 1136, 1144 (11th Cir. 2017) (citing *Lenz v. Winburn*, 51 F.3d 1540, 1545 (11th Cir. 1995)). "In applying each prong of this test, [courts] look to the general nature of the defendant's action, temporarily putting aside the fact that it may have been committed for an unconstitutional purpose, in an unconstitutional manner, to an unconstitutional extent, or under constitutionally inappropriate circumstances." *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1266 (11th Cir. 2004). "In other words, 'a court must ask whether the act complained of, if done for a proper purpose, would be within, or reasonably related to, the outer perimeter of an official's discretionary duties.'" *Mikko*, 857 F.3d at 1144 (quoting *Harbert Int'l, Inc. v. James*, 157 F.3d 1271, 1282 (11th Cir. 1998)). "Once the public official has established that he was acting within the scope of his discretionary authority, the burden shifts to the plaintiff to establish that qualified immunity does not apply." *Storck*, 354 F.3d at 1314 (citing *Lee*, 284 F.3d at 1194).

The United States Supreme Court has outlined a two-part test to determine whether a plaintiff meets its burden on rebutting a qualified immunity defense: (1) "[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?"; and (2) if a constitutional right would have been violated under the plaintiff's version of the facts, the court must then determine "whether the right was clearly established." *Saucier v. Katz*, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). Moreover, courts "may consider these two prongs in either order; an official is entitled to qualified immunity if the plaintiff fails to establish either." *Piazza v. Jefferson Cty., Ala.*, 923 F.3d 947, 951 (11th Cir. 2019) (citing *Jacoby v. Baldwin Cty.*, 835 F.3d 1338, 1344 (11th Cir. 2016)).

"[O]nly Supreme Court cases, Eleventh Circuit caselaw, and [Florida] Supreme Court caselaw can 'clearly establish' law in this circuit." *Thomas ex rel. Thomas v. Roberts*, 323 F.3d 950, 955 (11th Cir. 2003) (citing *Hamilton By & Through Hamilton v. Cannon*, 80 F.3d 1525, 1532 n.1 (11th Cir. 1996)). The essence of this inquiry is the "public official's objective reasonableness, regardless of his underlying intent or motivation." *Kingsland*, 382 F.3d at 1231-32 (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 819, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982); *Lee*, 284 F.3d at 1195). "To be clearly established, the contours of an asserted constitutional right 'must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Jones v. Cannon*, 174 F.3d 1271, 1282 (11th Cir. 1999) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)). "[I]n the light of pre-existing law, the unlawfulness must be apparent." *Anderson*, 483 U.S. at 640, 107 S. Ct. 3034. "Qualified immunity 'gives ample room for mistaken judgments' but does not protect 'the plainly

incompetent or those who knowingly violate the law.'" *Kingsland*, 382 F.3d at 1231-32 (quoting *Malley v. Briggs*, 475 U.S. 335, 343, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986)).

Nonetheless, "[t]he Supreme Court and [the Eleventh Circuit] have stated that a plaintiff cannot strip a § 1983 defendant of his qualified immunity by citing to general rules or abstract rights." *Jones*, 174 F.3d at 1282 (citing *Anderson*, 483 U.S. at 639, 107 S. Ct. 3034); *see Walker v. Schwalbe*, 112 F.3d 1127, 1132 (11th Cir. 1997) ("Plaintiffs may not discharge their burden [of showing that a right is clearly established] by referring to general rules and abstract rights."). "Qualified immunity focuses on the actual, specific details of concrete cases." *Walker*, 112 F.3d at 1132. Indeed, "'clearly established law' should not be defined 'at a high level of generality'" but "must be 'particularlized' to the facts of the case" because otherwise "'[p]laintiffs would be able to convert the rule of qualified immunity . . . into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights.'" *White v. Pauly*, 137 S. Ct. 548, 552 (2017) (citations omitted).

Additionally, "[b]ecause § 1983 'requires proof of an affirmative causal connection between the official's acts or omissions and the alleged constitutional deprivation,' each defendant is entitled to an independent qualified-immunity analysis as it relates to his or her actions and omissions." *Alcocer v. Mills*, 906 F.3d 944, 951 (11th Cir. 2018) (quoting *Zatler v. Wainwright*, 802 F.2d 397, 401 (11th Cir. 1986) (per curiam)). Thus, in conducting a § 1983 analysis, courts must "evaluate a given defendant's qualified-immunity claim, considering only the actions and omissions in which that particular defendant engaged." *Id.* Accordingly, the Court will individually address each Defendant's actions below.

### B.    Discretionary authority

As noted, Defendants carry the initial burden to demonstrate that they were acting within

the scope of their discretionary authority when the allegedly unconstitutional acts took place. This inquiry is two-fold: "[w]e ask whether the government employee was (a) performing a legitimate job-related function (that is, pursuing a job-related goal), and (b) through means that were within his power to utilize." *Holloman ex rel. Holloman*, 370 F.3d at 1265. Here, Defendants' challenged actions arise from their investigation of the alleged disturbance in the park stemming from Plaintiff's encounter with Beckford and Jackson, and Plaintiff's subsequent involuntary detention.

Plaintiff alleges that Defendants were employed at the Lauderhill Police Department and at "the time of the alleged claim" were "on duty" and acting in their "individual capacity[ies]," and he came into contact with Defendants because "two patrons had called 911 and complained that [he] was in the park disturbing the peace." *See* ECF No. [35] at ¶¶ 3-5, 18. The Complaint's allegations show that Defendants became involved with Plaintiff in response to investigating citizen complaints while they were on duty. The Complaint, accordingly, presents facts that satisfy Defendants' burden. *See Navarro v. City of Riviera Beach*, 192 F. Supp. 3d 1353, 1362 (S.D. Fla. 2016) (finding that it was "undisputed" that sheriff was acting in his discretionary capacity where the complaint alleged that the sheriff was "at all times material . . . duly appointed and acting in his individual capacity as Sheriff of the Palm Beach County Sheriff's Office"); *Gonzales v. Israel*, No. 15-CIV-60060, 2015 WL 1143116, at *7 (S.D. Fla. Mar. 13, 2015) (finding that the discretionary authority prong was established where complaint alleged that the defendants were "acting under color of state law" at all relevant times); *Bozeman v. Pollock*, No. 14-CIV-60493, 2015 WL 11197743, at *6 (S.D. Fla. Apr. 16, 2015) (stating that "[i]n this case, Pollock 'responded to a call on his police radio, investigated the scene, and made an arrest. Such actions clearly fall within his discretionary authority as a law-enforcement officer'"). Plaintiff does not dispute that Defendants acted within their discretionary authority. Therefore, Defendants have carried their

burden, and the burden now shifts to Plaintiff to establish that qualified immunity does not apply.

### C.    Qualified immunity – Fourth Amendment claim

The gist of Plaintiff's Fourth Amendment violation claim in Count I is that he was involuntarily detained under the Baker Act without probable cause. According to Plaintiff, Defendants arrested him in "bad faith" because no mental health professional certified that he met the criteria for involuntary examination, there was "no other valid or viable reasons to believe that Plaintiff had a mental illness," and none of the Defendants gave him a "conscientious explanation and disclosure of the purpose of the examination, and there [was] no reliable evidence to support that Plaintiff met the criteria for involuntary examination." ECF No. [35] at ¶ 8.

Regarding this count, the Eleventh Circuit in *Watkins I* previously analyzed the initial complaint's Fourth Amendment claim as follows:

> "[T]he existence of probable cause at the time of arrest is an absolute bar to a subsequent constitutional challenge to the arrest" under both the First and Fourth Amendments. *Gates v. Khokhar*, 884 F.3d 1290, 1297-98 (11th Cir. 2018). "Probable cause exists where the facts within the collective knowledge of law enforcement officials, derived from reasonably trustworthy information, are sufficient to cause a person of reasonable caution to believe that a criminal offense has been or is being committed." *Id*. at 1298. Even absent actual probable cause, a claim for false arrest is subject to dismissal if the police officer had "'arguable' probable cause to arrest the plaintiff." *Id*. "Arguable probable cause exists where reasonable officers in the same circumstances and possessing the same knowledge as the defendant could have believed that probable cause existed to arrest." *Id*. (alteration omitted). "Whether an officer possesses probable cause or arguable probable cause depends on the elements of the alleged crime and the operative fact pattern." *Brown v. City of Huntsville*, 608 F.3d 724, 735 (11th Cir. 2010).
>
> Under Florida's Baker Act, a person may be subjected involuntarily to a mental health examination if "[t]here is a substantial likelihood that without care or treatment the person *will* cause *serious bodily* harm to himself or herself or others in the *near future*, as evidenced by *recent behavior*." Fla. Stat. § 394.463(1)(b)(2) (emphasis added). Police officers "shall take a person who appears to meet the criteria for involuntary examination into custody and deliver the person" to an appropriate mental health facility for examination. *Id*. § 394.463(2)(a)(2).

For Plaintiff to be detained lawfully under the Baker Act, probable cause must have existed -- evidenced by Plaintiff's recent behavior -- to believe that a "substantial likelihood" existed that Plaintiff would cause "serious bodily harm" to himself or to others in the near future. This standard is a high one: for example, a reasonable belief about "some likelihood," "might cause" "some kind of bodily harm," "at some point in the future" is not good enough for probable cause to deprive a person of their freedom.

Under Plaintiff's version of the facts -- which we now must accept as true and must construe in Plaintiff's favor at this early stage of the proceedings -- Plaintiff remained at all pertinent times near his car, which was more than 60 feet away from the area where people were walking and jogging. Plaintiff denies flatly that he acted in an aggressive or hostile manner either toward Beck[ford] and Jackson or toward Defendant Officers. Plaintiff also denies flatly ever holding or waving a knife on the pertinent day. To the extent there existed a risk of a physical altercation, Plaintiff says that Jackson was the aggressor and that Plaintiff simply ignored Jackson.

Also according to the complaint, the officers saw nothing to the contrary on the day of the arrest; Plaintiff says the officers claim that they saw him have moments of anger after they confronted him, but he denies that. On top of that, the event at another park about 8 months earlier is not referred to as one involving actual violence -- even IF we accept that an older event that occurred 8 months previously might be evidence of "recent behavior" for the Baker Act.

Based on the limited record before us on appeal, an objective officer could not have concluded reasonably that a "substantial likelihood" existed that Plaintiff would soon "cause serious bodily harm" to himself or to others. Nor can we say that Plaintiff's version of the facts is so implausible that he can state no claim for relief. Because Plaintiff has alleged sufficient facts from which we may infer, for now at least, that he was detained under the Baker Act without probable cause or even arguable probable cause, the district court erred in dismissing Plaintiff's claim under the Fourth Amendment.

*Watkins I*, 797 F. App'x at 442–43. Although the underlying complaint at issue in *Watkins I* is no longer operative, the instant Amended Complaint is substantially similar to the one under consideration by the Eleventh Circuit. That panel vacated this Court's dismissal of Plaintiff's claims against Defendants, in which the Court determined that Defendants were entitled to qualified immunity upon the facts alleged in the initial complaint.

> ### i.    *Officers Yopps and Ramos*

Defendants Yopps and Ramos asserts that they are entitled to qualified immunity because the Amended Complaint lacks specific factual allegations detailing their actions toward Plaintiff except that they followed Bigwood's order to arrest him. ECF No. [40] at 5-6. In their view, Plaintiff provides no reason why these officers should not have followed Bigwood's orders to detain Plaintiff. *Id.* Yopps asserts that "[n]othing on the face of Plaintiff's Complaint gives any indication that [he] was in anyway involved in the investigation at issue or that [he] knew or should have known that his conduct may *allegedly* violate Plaintiff's constitutional rights." *Id.* at 5 (emphasis in original). Yopps cites to two Eleventh Circuit decisions that affirmed qualified immunity under a summary judgment setting where no record evidence showed that the officers acted unreasonably in following their superiors' orders nor why they should have questioned the validity of that order. *See id.* (citing *Hartsfield v. Lemacks*, 50 F.3d 950 (11th Cir. 1995) and *Brent v. Ashley*, 247 F.3d 1294, 1306 (11th Cir. 2001)). Ramos asserts that the "same principle applies to" him. *Id.* He acknowledges, however, that the Amended Complaint alleges that he made initial contact with Plaintiff and handcuffed Plaintiff and transported him to a mental facility at Bigwood's direction, but he asserts that there is "once again no indication or allegations that [he] knew or should have known that Sgt. Bigwood's orders allegedly may have violated Plaintiff's constitutional rights (which they did not))." *Id.*

Plaintiff, in response, concedes that he "could, and arguably should, have provided more factual details as to Ramos' and Yopps' involvement in the incident."[5] ECF No. [43] at 2.

---

[5] In the Response, Plaintiff supplies additional facts that, in his opinion, confirm that Officers Yopps and Ramos violated his Fourth Amendment rights. *See* ECF No. [43] at 2-3. The Court will not consider these newly asserted allegations when ruling on the instant Motion. *See, e.g.*, *Wilchombe v. TeeVee Toons, Inc.*, 555 F.3d 949, 959 (11th Cir. 2009); *Marabella v. NCL (Bahamas), Ltd.*, No. 19-CV-25185, 2020 WL 533987, at *1 n.1 (S.D. Fla. Feb. 3, 2020).

Regardless, he maintains that when the Complaint's allegations are viewed in a light most favorable to him, the allegations show that Ramos and Yopps acted unreasonably in following Bigwood's order, and that they knew or should have known that arresting him might result in a constitutional violation. *Id.* In particular, he argues that all Defendants responded to the park to investigate the 911 call, they were all present during the investigation, observed his behavior and demeanor and heard his responses to Bigwood's questioning, they knew that he disputed Beckford's and Jackson's reports, and knew that he did not qualify for Baker Acting. *Id.* (citing ECF No. [35] at ¶¶ 8-10, 18-34).[6] Upon review and consideration, and in light of *Watkins I*, the Court agrees with Plaintiff that he has stated a sufficient claim against Officers Yopps and Ramos and that they are not entitled to qualified immunity at this time.

### ii.    *Sgt. Bigwood*

Defendant Bigwood asserts that he is entitled to qualified immunity regarding the Fourth Amendment claim because he was authorized to take Plaintiff to an appropriate mental facility pursuant to Fla. Stat. § 394.463(1). He adds that "[t]o defeat qualified immunity, [Plaintiff's] factual allegations must demonstrate that reasonable officers—possessing the same knowledge as the defendants—could not have believed that [Plaintiff] appeared to meet the criteria for involuntary examination." ECF No. [40] at 6 (quoting *Bright v. Thomas*, 754 F. App'x 783, 786 (11th Cir. 2018)). He notes that police officers are entitled to rely on victim statements and

---

[6] Plaintiff requests in his Response that, "if this [C]ourt finds that the facts are insufficient to sustain a claim against Yopps and Ramos, he be allowed to amend his Complaint to more clearly state facts regarding "Yopps and Ramos' presence and observation of their and Bigwood's investigation of the 911 call that was headed by Bigwood[.]" ECF No. [43] at 9. The Court declines Plaintiff's invitation for leave to amend because it is procedurally improper. *See Cita Tr. Co. AG v. Fifth Third Bank*, 879 F.3d 1151, 1157 (11th Cir. 2018). Further, the Court notes that it previously explained to Plaintiff that requesting leave in this manner is improper when it rejected an identical request in response to the previous motion to dismiss. *See Watkins v. Bigwood*, No. 18-CV-63035, 2020 WL 1166720, at *5 n.6 (S.D. Fla. Mar. 11, 2020).

eyewitness accounts, and that pursuant to *Bright*, 754 F. App'x 783, which he characterizes as instructive, Bigwood's actions were justifiable. *Id.* at 7. He further maintains that the Amended Complaint fails to allege facts reflecting that his reliance on Beckford and Jackson's reports was unreasonable, *id.*, Plaintiff in fact possessed two knives even though he denied waiving at knife, *id.* at 8, and Plaintiff volunteered his prior trespass history to Bigwood for singing the anti-gay song at another park. *Id.* In Bigwood's view, Plaintiff "offers no sound explanation" for why Bigwood's decision to "credit the victims' reports" "notwithstanding Plaintiff's denials" was unreasonable under the circumstances and based upon information known to Bigwood at the time. ECF No. [46] at 3.

Plaintiff, in response, contends that *Bright* is materially distinguishable, Beckford's report that he was waiving a knife while singing was not corroborated, Bigwood requested Plaintiff to sing the song for him because he wanted to hear the lyrics, Plaintiff only informed Bigwood about the April 2014 incident at another park because Bigwood "had his facts wrong" as that incident did not involve violence, and he only expressed his conspiracy beliefs that his detention was a retaliatory arrest "after Bigwood decided to arrest him for the purpose of Baker Acting him because [Bigwood] knows there was no probable cause to arrest or Baker Act him." ECF No. [43] at 3-6.

In *Bright*, a *pro se* plaintiff sued several police officers under § 1983 for involuntarily committing him for a psychiatric evaluation. 754 F. App'x at 784. According to the complaint, after plaintiff complained about poor customer service at a restaurant, restaurant employees assaulted him by throwing hot grease at his face and punching him. *Id.* He then called the police to report the attack. *Id.* Upon arriving at the scene, the police heard different versions of events from plaintiff and the employees, including the employees' collective story that plaintiff was the instigator and had hit two employees, and that the employees were defending themselves. *Id.*

17

Sometime thereafter, while the police were present, plaintiff grabbed one of the employees by the waist, which prompted the officers to restrain plaintiff and take him to a nearby hospital under the Baker Act, Fla. Stat. § 394.463. *Id.* Plaintiff, in response, filed his civil rights complaint.

The district court ruled that the police officers were entitled to qualified immunity on plaintiff's false arrest claim under § 1983. *Id.* at 785. On appeal, the Eleventh Circuit panel held that based on the complaint's factual allegations, the officers had arguable probable cause to detain and commit plaintiff under the Baker Act. *Id.* at 786. In this respect, "[w]hether an officer possesses probable cause or arguable probable cause depends on the elements of the alleged crime and the operative fact pattern." *Id.* As alleged in the complaint, the police were called in response to a physical altercation, the officers observed plaintiff with blood in his mouth and he "either had just grabbed, or was still grabbing," one of the employees. *Id.* Further, the employees "in concert" told the officers that plaintiff instigated the altercation by attacking them. *Id.* Upon this factual sequence, the panel concluded that the district court's ruling "was correct" because the officers were told by "multiple alleged victims or eyewitnesses that [plaintiff] attacked" the employees, and upon hearing the employees' version of events and "observing the surrounding circumstances," they could have believed that plaintiff met the criteria for involuntary examination and that he might cause serious bodily harm to himself or others. *Id.* at 787-87.

The plaintiff, moreover, alleged "no facts that were known to the officers to suggest that it was objectively unreasonable for them to believe the" employees even though he alleged the officers "knew" the employees "were lying and that the employees' version of events was 'impossible, ridiculous, or even ludicrous.'" *Id.* at 787. Indeed, the complaint failed to allege "facts explaining how the officers knew the employees were lying or why the employees' version of events was implausible." *Id.* Importantly, the panel noted that even if the employees' statement

and accusations alone were insufficient to provide arguable probable cause, the officers observed plaintiff in a physical altercation after arriving at the scene. *Id.* at 788. This fact, coupled with the consistent version of events told to the officers by the employees, could have led the officers to have believed that plaintiff met the requirements for involuntary commitment. *Id.* at 788.

Returning to the instant case, and upon careful review and consideration, the Court agrees with Plaintiff that *Bright* is distinguishable. As previously noted in *Watkins I*, Plaintiff alleges that he remained at all times near his car; he denies acting aggressively toward Beckford and Jackson or Defendants; he denies holding or waiving a knife; he alleges that Jackson was the aggressor and that he ignored him; and according to the Complaint, Defendants saw nothing to the contrary. 797 F. App'x at 442. Unlike *Bright*, there was no underlying physical altercation, and the officers did not observe any conflict in progress or have an objective reason to believe that Plaintiff was violent. The April 2014 incident at another park, moreover, involved the same song but it did not involve another patron or concerns about Plaintiff engaging in violent conduct. ECF No. [35] at ¶ 28. To be sure, Beckford reported that Plaintiff waived a knife. However, Plaintiff explained to Defendants that he was homeless and living out of his car. He also denied having taken any knives out as he had not prepared breakfast at the time of the incident. *Id.* at ¶¶ 22-24. No factual allegations were presented to demonstrate otherwise, and no facts show that there was a substantial likelihood that Plaintiff would cause harm to himself or to others. Thus, while Bigwood could consider Beckford's reports in his investigation, the allegations in the Complaint, taken as true, show that the "surrounding circumstances" and information known to Bigwood did not warrant Baker Acting Plaintiff based on the prior 2014 incident or his "constant singing" of the anti-gay song.

In light of the factual allegations raised and against the backdrop of *Watkins I*, the Court concludes that the Amended Complaint sufficiently alleges that an objective officer could not have concluded reasonably that Plaintiff met the criteria for involuntary examination under the Baker Act. Accordingly, Bigwood is not entitled to qualified immunity under Count I.

### D.        Qualified immunity – First Amendment claim

The crux of Plaintiff's First Amendment claim in Count II is that Defendants violated his right to free speech by Baker Acting him for his singing and in retaliation for his lawsuits against Lauderhill police officers. He alleges that there was no "valid, viable or reliable reasons or evidence to justify involuntary examination and Baker Acting." ECF No. [35] at ¶ 9.

Regarding this count, the Eleventh Circuit in *Watkins I* previously analyzed the initial complaint's First Amendment claim as follows:

> To state a claim for retaliation under the First Amendment, a plaintiff must show that (1) he engaged in protected speech; (2) the defendant's conduct adversely affected his protected speech; and (3) a causal connection between the adverse conduct and the protected speech. *Bennett v. Hendrix*, 423 F.3d 1247, 1250 (11th Cir. 2005). "A plaintiff suffers adverse action if the defendant's allegedly retaliatory conduct would likely deter a person of ordinary firmness from the exercise of First Amendment rights." *Id.* at 1254.

> Under the circumstances alleged by Plaintiff, Plaintiff's singing clearly constituted protected speech. The "most basic" principle underlying the First Amendment's right to free speech is that the "government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Brown v. Entm't Merchs. Ass'n*, 564 U.S. 786, 790-91, 131 S.Ct. 2729, 180 L.Ed.2d 708 (2011). The Supreme Court has recognized few exceptions to this broad protection only for "well-defined and narrowly limited classes of speech," including obscenity (i.e., sexual content), incitement of violence, and fighting words. *Id.* at 791, 131 S.Ct. 2729.

> The lyrics of the anti-gay song involved in this case -- as distasteful and offensive as they likely are to many people -- seem to fall within no exception to the First Amendment's protection. Although the song included references to violence, nothing in the assumed facts establishes that Plaintiff was seeking to or was likely to incite imminent violence toward homosexuals. *See Brandenburg v. Ohio*, 395 U.S. 444, 448, 89 S.Ct. 1827, 23 L.Ed.2d 430 (1969) ("[T]he constitutional

guarantees of free speech and free press do not permit a State to forbid or proscribe advocacy of the use of force or of law violation except where such advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action."). Nor did the song – objectively viewed in the context of Plaintiff's version of the facts – fit the narrow constitutional exception for "fighting words": His merely singing in an out-of-doors, public place, a recognized song that has been available to the public to hear otherwise in a variety of ways, more than 60 feet away from the pertinent walkway for passersby, and without addressing any particular person would be protected speech. For background, see *Cohen v. Cal.*, 403 U.S. 15, 20, 91 S.Ct. 1780, 29 L.Ed.2d 284 (1971) (describing "fighting words" as "those personally abusive epithets which, when addressed to the ordinary citizen, are, as a matter of common knowledge, inherently likely to provoke violent reaction"; and concluding that the words "Fuck the Draft" written on a jacket constituted no "fighting words" in part because the words were "clearly not 'directed to the person of the hearer.'").

About the second element, we have no trouble concluding that being taken into custody for an involuntary mental examination is the kind of conduct that would deter a person of ordinary firmness from exercising his rights under the First Amendment. (The practice of treating people who hold unpopular views as mentally ill is not uncommon in this world and can readily be frightening.) Plaintiff has also alleged sufficient facts from which a factfinder could infer a causal connection between Plaintiff's singing and his detention. Among the reasons Sergeant Bigwood gave for determining that Plaintiff needed a mental examination included Plaintiff's "constant singing of the anti-gay song in parks" and Officer Manchula's previous encounter with Plaintiff on 17 April 2014: an incident that also involved Plaintiff's singing of an anti-gay song. Plaintiff has thus alleged sufficient facts to state a plausible claim for violation of his clear rights under the First Amendment.

797 F. App'x at 443–44. Since that opinion was issued, the Eleventh Circuit has revisited

Plaintiff's singing of the anti-gay song in the context of whether a park manager and park employee

were entitled to qualified immunity for an alleged First Amendment violation. *See Watkins II*, 799

F. App'x 659. Specifically, Plaintiff's claims in *Watkins II* arose from two incidents, in May 2013

and April 2014, in which he was removed and subsequently banned from a park after loudly and

repeatedly singing the anti-gay song at issue in the present case. *Id.* at 662. In analyzing the First

Amendment claims, the court ruled as follows:

We next turn to the grant of summary judgment as to the First Amendment claims against [park manager] Finch and [park employee] Wishnoff. The district court

concluded both Finch and Wishnoff were entitled to qualified immunity because they were acting within their discretionary authority and did not violate any clearly established constitutional right of which a reasonable person would have been aware.

. . .

Here, the district court did not err in concluding that Finch and Wishnoff were entitled to qualified immunity as to his First Amendment claims. Watkins does not dispute that both Finch and Wishnoff were acting within the scope of their discretionary authority when they acted to have him removed and banned from the park. As a result, to overcome qualified immunity, Watkins bears the burden to demonstrate that they violated a clearly established constitutional right. *See Gaines*, 871 F.3d at 1208.

Watkins has failed to meet this burden for two reasons. First, Finch offered an alternative, lawful basis for the decision to remove and ban Watkins from the park; one based on Watkins's conduct rather than the content of the song he chose to sing. In a sworn declaration, Finch stated he had received complaints from other park patrons and employees that Watkins had been screaming, yelling, or ranting at them, and he discussed those complaints with the other employees, including Wishnoff. Watkins failed to offer contrary evidence creating an issue of material fact as to this asserted basis for his removal, one that does not implicate his First Amendment rights, clearly established or otherwise.

Second, even assuming the content of Watkins's speech—and not his disorderly conduct—was the basis for his removal, a reasonable official could have believed, under the circumstances of this case, that Watkins's speech constituted unprotected intimidation. The First Amendment does not protect "true threats," which are "statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals." *See Virginia v. Black*, 538 U.S. 343, 347–48, 359–60, 123 S.Ct. 1536, 155 L.Ed.2d 535 (2003) (noting the First Amendment does not protect "true threats," including acts of "[i]ntimidation" where the speaker intends to place the listener in fear of bodily harm or death).

The lyrics Watkins was singing advocated violence against gay people, and Watkins admitted that he sang that song to deter gay people from being around him. Under these specific circumstances, and given the ambiguity as to whether Watkins's speech was indeed protected, we cannot say that "every objectively reasonable government official facing the circumstances would know that the official's conduct did violate federal law when the official acted." *Vinyard*, 311 F.3d at 1351; *see also Pace v. Capobianco*, 283 F.3d 1275, 1282–84 (11th Cir. 2002) ("[T]he preexisting law must give real notice of practical value to governmental officials, considering the specific circumstances confronting them, and not just talk of some generalized, abstract intellectual concept.").

Accordingly, the district court properly granted summary judgment as to Watkins's First Amendment claims.

*Id.* at 665-67 (footnotes omitted).

In light of these two decisions, Defendants assert that Plaintiff cannot demonstrate that they had "real notice of practical value" that detaining Plaintiff based on the anti-gay music would violate clearly established law. ECF No. [40] at 9. They add that the Amended Complaint's allegations show that it "was not clearly established in December 2014 that Plaintiff's detention violated the First Amendment nor was it in retaliation for the content of Plaintiff's speech." *Id.* at 10. According to Defendants, Plaintiff's denial that he had his knife out "is simply not credible, based on the totality of the allegations." *Id.* at 10. They conclude that Plaintiff's "allegations about the content of the song [he] was singing, coupled with the claims that the lyrics upset Beckford and Jackson and their report that Plaintiff was simultaneously waiving a knife, clearly reflect that a reasonable official could have believed that Plaintiff's speech constituted unprotected intimidation." *Id.* at 11. Thus, they assert that Defendants are entitled to qualified immunity at this stage on Count II. *Id.*

Upon review and consideration, the Court disagrees. In *Watkins I*, the Eleventh Circuit held that "[u]nder the circumstances alleged by Plaintiff, Plaintiff's singing clearly constituted protected speech," the lyrics "seem to fall within no exception to the First Amendment's protections,"  and while the lyrics included violent references, "nothing in the assumed facts establishes that Plaintiff was seeking to or was likely to incite imminent violence toward homosexuals." 797 F. App'x at 443. Indeed, the court noted that "merely singing in an out-of-doors, public place, a recognized song that has been available to the public to hear . . . more than 60 feet away from the pertinent walkway for passersby, and without addressing any particular person" did not constitute "fighting words." *Id.* The court further explained that the prior

complaint's allegations alleged sufficient facts for a factfinder to infer a causal connection between Plaintiff's singing and his detention. *Id.* at 444. The court also had "no trouble concluding" that detaining a person for an involuntary mental examination would deter a person of ordinary fitness from exercising his First Amendment rights. *Id.*

In *Watkins II*, by contrast, which involved a summary judgment posture, the record established that Plaintiff was removed from the park because of disorderly conduct, including "screaming, yelling, or ranting" at park patrons and employees, rather than the content of the song. 799 F. App'x at 666. Further, he was not involuntarily detained for a mental examination in that incident. That court noted, additionally, that even if the content of his speech was the basis for his removal in that case, under the "specific circumstances" of the case, a reasonable official could have concluded that Plaintiff's speech constituted "unprotected intimidation" as Plaintiff admitted he sang the song to "deter gay people from being around him" and it was "ambig[uous] as to whether Waktins's speech was indeed protected[.]" *Id.* at 667.

Here, the factual record has not been developed. The Court, consequently, will not make fact findings as to whether Plaintiff intended to engage in "unprotected intimidation" or whether he waved a knife toward Beckford and Jackson during the incident, which allegations Plaintiff denies. Plaintiff alleges that he was never violent or aggressive. He also alleges that he ignored Jackson while he was singing his song, the song "was not directed at anyone" and "no one complained or felt that it was directed at them." Plaintiff denies that he told Bigwood that he hated homosexuals. *See* ECF No. [35] at ¶¶ 14, 21, 24-25, 28, 32, 40, 41. Taking Plaintiff's allegations as true and construed in a light most favorable to him, the Court cannot conclude that qualified immunity is appropriate.

Case No. 18-cv-63035-BLOOM/Valle

IV.    **CONCLUSION**

Accordingly, it is **ORDERED AND ADJUDGED** that

1.    The Motion, **ECF No. [40]**, is **DENIED.**

2.    Plaintiff's Motion for Leave, **ECF No. [47]**, is **DENIED AS MOOT**.

3.    Defendants shall file their respective Answers to the Amended Complaint no later than

**May 12, 2020.**

**DONE AND ORDERED** in Chambers at Miami, Florida, on April 30, 2020.

**BETH BLOOM
UNITED STATES DISTRICT JUDGE**

Copies to:

Counsel of Record

Eric Watkins
7990 Hampton Blvd
Apt. 110
North Lauderdale, FL 33068
Email: kemet121671.ew@gmail.com