UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No.  18-cv-63035-BLOOM/Valle

ERIC WATKINS,

      Plaintiff,

vs.

SERGEANT M. BIGWOOD, *et al.*,

      Defendants.

_____/

## ORDER

**THIS CAUSE** is before the Court upon Defendant City of Lauderhill's ("Defendant"), Motion to Dismiss, ECF No. [53] ("Motion"). Plaintiff filed his Response, ECF No. [55] ("Response"), to which Defendant filed its Reply, ECF No. [56] ("Reply").[1] The Court has considered the Motion, the Response, the Reply, the record in this case, the applicable law, and is otherwise fully advised. For the reasons set forth below, the Motion is granted.

## I.    BACKGROUND

On March 11, 2020, the Court granted in part and denied in part Co-Defendant Officers' motion to dismiss and motion for more definite statement. *See* ECF No. [30] ("Order"). Specifically, the Court dismissed the official capacity claims against Co-Defendant Officers without prejudice and required Plaintiff to file an amended complaint that comports with Rules 8 and 10, Fed. R. Civ. P. *See id.* On March 19, 2020, Plaintiff filed his First Amended Complaint,

---

[1] Co-Defendants, Sergeant M. Bigwood ("Bigwood"), Officer T. Yopps ("Yopps"), and Officer Samuel Ramos ("Ramos") (collectively, "Co-Defendant Officers") filed an Answer and Affirmative Defenses, *see* ECF No. [54], to the operative Second Amended Complaint, ECF No. [49] ("SAC"). Plaintiff also filed a motion for leave to file a sur-reply, ECF No. [57], which motion was denied on June 17, 2020. ECF No. [58].

ECF No. [35], in which he brought two counts against Co-Defendant Officers only in their individual capacities and no counts against Defendant. *See* ECF No. [35] at ¶¶ 3-5. On April 30, 2020, the Court entered an Omnibus Order, ECF No. [48], denying Co-Defendant Officers' motion to dismiss that pleading. On May 4, 2020, Plaintiff filed the instant complaint in which he added Defendant as a new party Defendant, re-raised official capacity claims against Co-Defendant Officers, and added two new counts. *See* ECF No. [49]. Although the Court struck the SAC that same day because it was filed without Plaintiff having attained leave of court, *see* ECF No. [50], on May 6, 2020, the Court later reinstated the pleading. *See* ECF No. [52].

This action arises out of Plaintiff's involuntary detention for a mental health evaluation after joggers in a public park complained to Co-Defendant Officers about Plaintiff's alleged behavior—brandishing a knife and shouting anti-gay slurs—while in the park. *See generally* ECF No. [49]. Plaintiff alleges that he is homeless and lives out of his car. *Id.* at ¶ 23. He alleges that on December 15, 2014, he was sitting outside his car in Mullins Park while preparing to make breakfast, and he was singing an anti-gay reggae song.[2] *Id.* at ¶¶ 11, 22. According to Plaintiff, this had been his "routine for more than a year prior." *Id.* at ¶ 12. He was situated approximately 60 feet away from the walkway where patrons walk or exercise. *Id.* at ¶ 11. He asserts that two joggers, Tanika Beckford ("Beckford") and Jermaine Jackson ("Jackson"), were offended by Plaintiff's singing. *Id.* at ¶ 13. He alleges that Jackson believed that Plaintiff was speaking to him, but he ignored Jackson and continued to sing. *Id.* at ¶ 15. Jackson, in response, cursed at him and attempted to physically attack Plaintiff but was restrained by Beckford, and they walked out of the park while Plaintiff continued singing. *Id.* at ¶¶ 15-17, 22. According to Plaintiff, Beckford and

---

[2] The song's lyrics included references to shooting homosexuals, and it included derogatory terms such as "faggot" and "batty boy." *See id.* at ¶¶ 22, 27.

Jackson told him that they were going to call the police and have him arrested for singing the anti-gay song. *Id.* at ¶ 18.

Sometime later, Officers Ramos and Manchula[3] arrived on the scene. Ramos informed Plaintiff that the police were called in response to a complaint that he was "in the park disturbing the peace." *Id.* at ¶ 19. Plaintiff alleges that, in a "calm cool and collected manner," he informed Ramos that he was not creating a disturbance but that he was "merely singing a song boom bye bye in a [f]aggot boy head and the two patrons got upset and started cursing" at him. *Id.* at ¶ 20. Bigwood later arrived, and he informed Plaintiff that Beckford and Jackson had complained that he had been making anti-gay slurs while waiving a knife in his hand. *Id.* at ¶ 21. Plaintiff told Bigwood that he possessed two knives, which he uses to prepare his meals, but he denied having the knives out while he was singing because he had yet to prepare breakfast. *Id.* at ¶¶ 23-25. In response to Bigwood's question about how Beckford would know that he had a knife, Plaintiff informed him that every day he is "in the park with [his] desk outside [his] car and that [he is] either doing writing or preparing [his] meals." *Id.* at ¶ 26.

After Bigwood listened to Plaintiff sing the song and spoke with Beckford and Jackson, Bigwood reportedly informed Plaintiff that he believed Plaintiff needed a mental health examination based upon the incident at hand and a previous incident eight months earlier in April 2014 at another park. *Id.* at ¶¶ 27-28. Plaintiff alleges that that previous incident involved "a park manager wanting to officially trespass [Plaintiff] from the park" and that Officer Manchula had been involved in that incident. *Id.* at ¶¶ 29-30. Plaintiff also alleges that that incident did not involve complaints from patrons that he was shouting anti-gay slurs. *Id.* at ¶ 44. After speaking

_____

[3] Officer Manchula is not named as a defendant. Plaintiff alleges that he "had a history with" Officer Manchula. *See id.* at ¶ 19.

with Officer Manchula, Bigwood again told Plaintiff that he believed that he needed a mental evaluation because of his "constant singing of the antigay song in parks" and because he believed that Plaintiff had waived his knife as Beckford claimed. *Id.* at ¶ 31. According to Plaintiff, Bigwood asked him to voluntarily submit himself to a mental health examination, but he refused to go. *Id.* at ¶¶ 33-34.

The SAC alleges that Bigwood, in response, ordered Ramos and Yopps to arrest Plaintiff which they did. Plaintiff was handcuffed, placed in a police car, had his phone confiscated,[4] and was taken to a "mental facility." *Id.* at ¶¶ 35-36. Plaintiff denies that he was confrontational with the police, and Beckford and Jackson's reports to the police were unreliable and not provided in a sworn affidavit. *Id.* at ¶¶ 37-38. According to Plaintiff, Beckford and Jackson made various false statements to police, such as Plaintiff shouting anti-gay slurs at Jackson, appearing hostile and preparing to physically engage Jackson, and stabbing the air toward Jackson with a knife. *Id.* at ¶¶ 38, 40-41. Plaintiff also denies telling Bigwood that he hated homosexuals and that he had shouted anti-gay slurs. *Id.* at ¶ 42.

Plaintiff denies that his behavior varied from calm to angry, and he alleges that he never expressed feelings of a conspiracy that random citizens and police were targeting him without cause, which Bigwood allegedly reported. *See id.* at ¶ 43. He also denies telling Bigwood that he is "not fucking going anywhere." *Id.* at ¶ 45. According to Plaintiff, prior to December 15, 2014, no mental health professional had certified that he met the criteria for involuntary examination. *Id.* at ¶ 46. He further alleges that during his conversation with Bigwood, he expressed his belief that Bigwood's decision to arrest him under the Baker Act was a "conspiracy between Bigwood and

---

[4] Plaintiff alleges that he was video recording the entire incident on his cell phone, but that when he was released from the medical facility, the video was deleted from his phone, and only Officers Ramos and Manchula knew that he was recording the incident. *Id.* at ¶¶ 35, 39.

the other officers, especially Manchula and the complainants, but specifically the officers because of Plaintiff's past and present pending lawsuits against Lauderhill police officers, especially Manchula who Plaintiff had a pending lawsuit against," and that the decision to arrest him was "to retaliate against Plaintiff to cause him mental anguish and hardship and to disrupt and hinder Plaintiff from timely filing a response in court in the case against Manchula[.]" *Id.* at ¶ 47.

The SAC asserts four counts based on First and Fourth Amendment violations. Specifically, Count I asserts a Fourth Amendment violation against the Co-Defendant Officers. *See id.* at ¶ 9. Count II asserts a First Amendment claim against the Co-Defendant Officers. *See id.* at ¶¶ 3-6, 10. Count III asserts a Fourth and First Amendment claim against the Co-Defendant Officers in their official capacities. *See id.* at ¶ 52. And Count IV asserts a *Monell* claim against Defendant grounded on an alleged failure to train or inadequate training theory. *See id.* at ¶ 53.

According to Plaintiff, Defendant "failed to train and/or adequately train its officers, including [Co-Defendant Officers] in [(1)] knowing what potential kinds of behaviors, actions and related mental illnesses justifies a reason to believe that a person is mentally ill and warrants an immediate mental examination (2) knowing what potential mental illness the person may have based on their actions or behavior and how that suspected mental illness will cause them to refuse voluntary mental examination or not be able to determine for their self whether examination is necessary (3) knowing what potential behavior, actions or mental illness, without car[e] or treatment, would likely cause the persons to suffer from neglect or refuses to care for their self and that such neglect would cause a real and present threat of substantial harm to their well being and its not apparent that such harm maybe avoided via the help of their family or friends (4) knowing what kind of potential behavior, actions or mental illness would present a substantial likelihood that without care or treatment to the person will cause serious bodily harm to their selves or others

in the near future as evidence[d] by re[c]ent behavior." *Id.* at ¶ 57.

Plaintiff alleges that Defendant's Field Training Program "No. IG-29" for its officers regarding the mentally ill and Baker Act is "grossly inadequate training regarding probable cause" for involuntary detention. *Id.* at ¶¶ 58-59. He adds that Defendant's actions show "deliberate indifference" to his constitutional rights. *Id.* The SAC seeks $1,000,000 in compensatory damages from each Co-Defendant Officer, $5,000,000 from Defendant, and $2,000,000 in punitive damages from each Co-Defendant Officer. *Id.* at ¶¶ 62-63.

Defendant now moves to dismiss all claims pled against the Co-Defendant Officers in their official capacities and the alleged claim against "all police officers" employed by Defendant in Count I. *See* ECF No. [53].[5] Thus, Defendant seeks dismissal of Counts I-III. Additionally, Defendant moves to dismiss the *Monell* failure to train claim against Defendant for failing to state an actionable claim. *Id.*

Plaintiff responds with four arguments. First, he asserts that he does not raise an official capacity claim against any Defendant in Counts I or II, and he states that Count I is not directed against "all police officers" of the Lauderhill Police Department. ECF No. [55] at 1. Second, he maintains that the official capacity claim in Count III is sufficiently pled. *Id.* at 2-3. Third, he contends that he sufficiently pled a claim for failure to train in Count IV pursuant to *Canton v. Harris*, 489 U.S. 378 (1989). *Id.* at 3-5. Fourth, he concedes that he "made a mistake" in paragraph 59 of the SAC regarding his representation that the Field Training program reportedly does not give officers any authority to determine if a person has a mental illness. *Id.* at 5-6. However, he

---

[5] Counts I and II do not purportedly seek liability against Co-Defendant Officers in their official capacities. *See* ECF No. [49] at ¶¶ 9, 10. However, the SAC reflects generally that Plaintiff sues them in their individual and official capacities. *See id.* at ¶¶ 3-5. Therefore, Defendant asserts that it moves to dismiss Counts I and II "in an abundance of caution . . . to the extent Plaintiff has asserted these claims against the Officers in their official capacities." ECF No. [53] at 5.

stresses that the training program is inadequate regardless of his mistaken allegation. *Id.* at 6-7.

In reply, Defendant makes three arguments. First, it asserts that "in light of Plaintiff's clarification" of the scope of Counts I and II, it seeks "an order clarifying that Counts One and Two shall not be construed to assert claims against any officer in his or her official capacity or any claims against 'all police officers of the Lauderhill Police Department.'" ECF No. [56] at 1. Second, it argues that Count III should be dismissed because it fails to state a claim under any *Monell* theory. *Id.* at 2-3. In particular, Defendant asserts that, as a municipality, it cannot be a "final policymaker," and that Co-Defendant Officers cannot be the final policymakers based on the SAC's express allegations. *Id.* It also argues that to the extent Count III is based on a failure to train theory, it is "wholly duplicative" of Count IV. *Id.* at 3. Finally, Defendant asserts that any claim predicated on a failure to train theory fails. Specifically, it maintains that Plaintiff's analogy of the instant case to *Canton* is misplaced, Plaintiff fails to identify a pattern of similar constitutional violations by untrained employees, he fails to identify why the need for training was "so obvious" that the "single incident" exception should apply, and he ignores the training policy referenced in the SAC and attached to the Motion without addressing specifically how the training policy is inadequate based on its contents. *Id.* at 3-6.

The Motion, accordingly, is ripe for consideration.

## II.   LEGAL STANDARDS

### A.   Motion to dismiss

A pleading in a civil action must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Although a complaint "does not need detailed factual allegations," it must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S.

544, 555 (2007); *see Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (explaining that Rule 8(a)(2)'s pleading standard "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation"). Nor can a complaint rest on "'naked assertion[s]' devoid of 'further factual enhancement.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557 (alteration in original)).

When reviewing a motion under Rule 12(b)(6), a court, as a general rule, must accept the plaintiff's allegations as true and evaluate all plausible inferences derived from those facts in favor of the plaintiff. *See Miccosukee Tribe of Indians of Fla. v. S. Everglades Restoration Alliance*, 304 F.3d 1076, 1084 (11th Cir. 2002); *AXA Equitable Life Ins. Co. v. Infinity Fin. Grp., LLC*, 608 F. Supp. 2d 1349, 1353 (S.D. Fla. 2009). However, this tenet does not apply to legal conclusions, and courts "are not bound to accept as true a legal conclusion couched as a factual allegation." *Twombly*, 550 U.S. at 555; *see Iqbal*, 556 U.S. at 678; *Thaeter v. Palm Beach Cty. Sheriff's Office*, 449 F.3d 1342, 1352 (11th Cir. 2006). Moreover, "courts may infer from the factual allegations in the complaint 'obvious alternative explanations,' which suggest lawful conduct rather than the unlawful conduct the plaintiff would ask the court to infer." *Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1290 (11th Cir. 2010) (quoting *Iqbal*, 556 U.S. at 682).

A court considering a Rule 12(b) motion is generally limited to the facts contained in the complaint and attached exhibits, including documents referred to in the complaint that are central to the claim. *See Wilchombe v. TeeVee Toons, Inc.*, 555 F.3d 949, 959 (11th Cir. 2009); *Maxcess, Inc. v. Lucent Techs., Inc.*, 433 F.3d 1337, 1340 (11th Cir. 2005) ("[A] document outside the four corners of the complaint may still be considered if it is central to the plaintiff's claims and is undisputed in terms of authenticity.") (citing *Horsley v. Feldt*, 304 F.3d 1125, 1135 (11th Cir. 2002)).

### B.  *Pro se* **litigants**

"*Pro se* pleadings are held to a less stringent standard than pleadings drafted by attorneys and will, therefore, be liberally construed." *Tannenbaum v. United States*, 148 F.3d 1262, 1263 (11th Cir. 1998). This leniency, however, does not confer on *pro se* litigants "a right to receive special advantages not bestowed on other litigants. [The *pro se* litigant] must, for example, abide by local rules governing the proper form of pleadings." *Procup v. Strickland*, 760 F.2d 1107, 1115 (11th Cir. 1985). Further, courts cannot serve as *de facto* counsel for a party and cannot rewrite a deficient pleading for the sake of sustaining an action. *Jarzynka v. St. Thomas Univ. of Law*, 310 F. Supp. 2d 1256, 1264 (S.D. Fla. 2004). The Court cannot simply "fill in the blanks" to infer a claim, *Brinson v. Colon*, 2012 WL 1028878, at *1 (S.D. Ga. Mar. 26, 2012), as "it is not the Court's duty to search through a plaintiff's filings to find or construct a pleading that satisfies Rule 8," *Sanders v. United States*, 2009 WL 1241636, at *3 (N.D. Ga. Jan. 22, 2009); *see Bivens v. Roberts*, 2009 WL 411527, at *3 (S.D. Ga. Feb. 18, 2009) ("[J]udges must not raise issues and arguments on plaintiffs' behalf, but may only construe pleadings liberally given the linguistic imprecision that untrained legal minds sometimes employ." (citing *Miller v. Donald*, 541 F.3d 1091, 1100 (11th Cir. 2008))). In determining whether a *pro se* litigant has stated a claim, "the court ought not penalize the litigant for linguistic imprecision in the more plausible allegations," while keeping in mind that "wildly implausible allegations in the complaint should not be taken to be true." *Miller*, 541 F.3d at 1100.

### III.  DISCUSSION

Determining whether Defendant is entitled to dismissal of the claims at issue raises two overarching issues. The first is whether Plaintiff has stated an actionable "official capacity" claim in Count III. The second is whether Plaintiff has adequately stated a failure to train claim against

Defendant in Count IV. The Court will address each issue in turn.

### A.    Section 1983 and official capacity liability

"In contrast to individual capacity suits, when an officer is sued under Section 1983 in his or her official capacity, the suit is simply 'another way of pleading an action against an entity of which an officer is an agent.'" *Busby v. City of Orlando*, 931 F.2d 764, 776 (11th Cir. 1991). "Such suits against municipal officers are, therefore, in actuality, suits directly against the city that the officer represents." *Id.* "Because suits against a municipal officer sued in his official capacity and direct suits against municipalities are functionally equivalent, there no longer exists a need to bring official-capacity actions against local government officials, because local government units can be sued directly (provided, of course, that the public entity receives notice and an opportunity to respond)." *Id. See also Adcock v. Baca*, 157 F. App'x 118, 119 (11th Cir. 2005) ("When, as here, the defendant in a § 1983 civil rights action is the county sheriff, the suit is effectively an action against the governmental entity he represents[.]"); *Cook ex-rel. Estate of Tessier v. Sheriff of Monroe Cty. Fla.*, 402 F.3d 1092, 1115 (11th Cir. 2005) ("Personal-capacity suits seek to impose personal liability upon a government official for actions he takes under color of state law. Official-capacity suits, in contrast, generally represent only another way of pleading an action against an entity of which an officer is an agent. As long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity. It is not a suit against the official personally, for the real party in interest is the entity.") (quoting *Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985)).

### B.    Municipal liability under Section 1983 (*Monell* claim)

Any person acting under color of state law who violates a constitutional right of another is liable for the injured party's losses. 42 U.S.C. § 1983. "Section 1983 provides a fault-based

analysis for imposing municipal liability; therefore, plaintiffs must establish that the city was the person who caused them to be subjected to their deprivation." *Depew v. City of St. Marys, Ga.*, 787 F.2d 1496, 1499 (11th Cir. 1986). "[W]hen execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury th[en] the government as an entity is responsible under § 1983." *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978).

To impose Section 1983 municipal liability, a plaintiff must show: (1) that his constitutional rights were violated; (2) that the municipality had a custom or policy that constituted deliberate indifference to that constitutional right; and (3) that the policy or custom caused the violation. *McDowell v. Brown*, 392 F.3d 1283, 1289 (11th Cir. 2004). "A plaintiff . . . has two methods by which to establish a [municipal actor's] policy: identify either (1) an officially promulgated [ ] policy or (2) an unofficial custom or practice of the [municipal actor] shown through the repeated acts of a final policymaker for the [municipal actor]." *Grech v. Clayton Cnty., Ga.*, 335 F.3d 1326, 1329 (11th Cir. 2003). "Under either avenue, a plaintiff (1) must show that the local governmental entity . . . has authority and responsibility over the governmental function in issue and (2) must identify those officials who speak with final policymaking authority for that local governmental entity concerning the act alleged to have caused the particular constitutional violation in issue." *Id.* at 1330. "To establish a policy or custom, it is generally necessary to show a persistent and wide-spread practice[; h]owever, the custom need not receive formal approval." *Depew*, 787 F.2d at 1499; *see also Smith v. Mercer*, 572 F. App'x 676, 679 (11th Cir. 2014) ("A plaintiff must identify a 'consistent and widespread practice' of constitutional deprivations to prove local government liability for an unofficial custom."); *Carter v. Columbus Consol. Gov't*, 559 F. App'x 880, 881 (11th Cir. 2014) ("the challenged practice or

custom must be 'so pervasive as to be the functional equivalent of a formal policy'") (quoting *Grech*, 335 F.3d at 1330 n. 6).

Where a municipality's failure to train or supervise its employees in a relevant respect evidences a "deliberate indifference" to the rights of its inhabitants, such a shortcoming may constitute a "policy or custom" actionable under § 1983. *City of Canton v. Harris*, 489 U.S. 378, 389 (1989). "In addition, . . . a municipality's failure to correct the constitutionally offensive actions of its employees can rise to the level of a custom or policy 'if the municipality tacitly authorizes these actions or displays deliberate indifference' towards the misconduct." *Griffin v. City of Opa–Locka*, 261 F.3d 1295, 1308 (11th Cir. 2001) (citing *Brooks v. Scheib*, 813 F.2d 1191, 1193 (11th Cir. 1987)); *Canton*, 489 U.S. at 388 (rejecting city's argument that municipal liability can be imposed only where the challenged policy itself is unconstitutional, and finding that "there are limited circumstances in which an allegation of a 'failure to train' can be the basis for liability under § 1983"). That is, "a Section 1983 claim for inadequate training exists only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *Riley v. Newton*, 94 F.3d 632, 638 (11th Cir. 1996) (quotation omitted); *see also Canton,* 489 U.S. at 389 ("Only where a municipality's failure to train its employees in a relevant respect evidences a 'deliberate indifference' to the rights of its inhabitants can such a shortcoming be properly thought of as a city 'policy or custom' that is actionable under § 1983."); *Gold v. City of Miami*, 151 F.3d 1346, 1350–51 (11th Cir. 1998) ("[A]n allegation of failure to train or supervise can be the basis for liability under § 1983 . . . only where the municipality inadequately trains or supervises its employees, this failure to train or supervise is a city policy, and that city policy causes the employees to violate a citizen's constitutional rights.").

### C.      Count III

Because Plaintiff represents that he does not raise any official capacity claims in Counts I or II, *see* ECF No. [55] at 1, and the Court likewise does not find that these counts assert such claims, the Court first addresses Count III. This count alleges that Co-Defendant Officers, "in their official capacity, violated Plaintiff's Fourth Amendment right to be free from arrest and Baker Acting without probable cause and his First Amendment right to free speech in a park when they arrested and Baker Acted Plaintiff without probable cause pursuant to the City of Lauderhill's policy of failing to train, and or inadequately training its officers in knowing how to determine if a person their officers would come in contact with meets the criteria for involuntary Baker Acting." ECF No. [49] at ¶ 52. As noted above, because this claim is brought against Co-Defendant Officers in their official capacities, this is construed as a claim against Defendant. *Busby*, 931 F.2d at 776.

According to Defendant, Count III fails because there are no allegations that the Co-Defendant Officers had final policymaking authority, as is required to state a claim based on actions of a City employee. "The mere delegation of authority to a subordinate to exercise discretion is not sufficient to give the subordinate policymaking authority. Rather, the delegation must be such that the subordinate's discretionary decisions are not constrained by official policies and are not subject to review." *Mandel v. Doe*, 888 F.2d 783, 792 (11th Cir. 1989) (citation omitted).

Plaintiff responds that the City of Lauderhill "was the final policymaking authority[.]" ECF No. [55] at 2. He adds, however, that "[a]ssuming arguendo that under count three [Plaintiff] was required to claim that the officers ultimately Baker Acted him as the final policy or decision makers of the City one can infer the same thing from the claim under counts three and its supporting facts." *See id.* (citing ECF No. [49] at ¶¶ 52, 54-60). He states that the Court should not dismiss Count

III, but instead should give him an opportunity to amend if Count III is insufficiently pled. *Id.* at 3.

In reply, Defendant argues that Count III fails because a municipality cannot be a final policymaker. ECF No. [56] at 2 (citing *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481-83 ("Municipal liability attaches only where the decisionmaker possesses final authority to establish municipal policy with respect to the action ordered. The fact that a particular official—even a policymaking official—has discretion in the exercise of particular functions does not, without more, give rise to municipal liability based on an exercise of that discretion. The official must also be responsible for establishing final government policy respecting such activity before the municipality can be held liable.") (footnotes and internal citation omitted); *see also Willingham v. City of Valparaiso Fla.*, 638 F. App'x 903, 906–07 (11th Cir. 2016) (noting that a city commission is not an official for purposes of *Monell*). Similarly, it maintains that the Co-Defendant Officers cannot be the final policymaker for liability purposes.

This Court previously found that Plaintiff did not state an actionable *Monell* claim based on allegations made against Co-Defendant Officers in their official capacities. *See Watkins v. Bigwood*, No. 18-CV-63035, 2020 WL 1166720, at *5 (S.D. Fla. Mar. 11, 2020). Upon review, the instant SAC likewise suffers from insufficient allegations. Plaintiff does not allege the identity of the officials with final policymaking authority so as to render Defendant liable. *See, e.g.*, *Andrade v. Miami Dade Cty.*, No. 09-23220-CIV, 2011 WL 4345665, at *8-9 (S.D. Fla. Sept. 16, 2011) (dismissing *Monell* claim where plaintiff failed to identify a final policymaker, and rejecting plaintiff's argument that the identification of a policymaker is "unnecessary" because plaintiff "apparently conflates the determination of official policymaker . . .with the necessity of alleging an official policymaker as an element of stating § 1983 claim"); *Quintanilla v. Miami-Dade Cty.*,

No. 09-20821-CIV, 2009 WL 3334343, at *1 (S.D. Fla. Oct. 15, 2009) (dismissing claim for failing to "allege the identity of the final policymaking authority responsible for the alleged custom or policy that caused the Plaintiff's injuries," and noting that for section 1983 liability to attach to a municipality, a plaintiff "must identify those officials who speak with final policymaking authority for that local governmental entity concerning the act alleged to have caused the particular constitutional violation in issue") (citing *Grech*, 353 F.3d at 1329); *Estate of Osorio v. Miami-Dade Cty.*, 191 F. Supp. 3d 1366, 1370 (S.D. Fla. 2016) (dismissing section 1983 claim where plaintiff provided no factual allegations of a single official or unofficial policy, failed to identify a final policymaker, and only included conclusory allegations); *see also Hill v. Clifton*, 74 F.3d 1150, 1152 (11th Cir. 1996) ("Municipalities may be sued under 42 U.S.C. § 1983 if an official policy or custom of the municipality violates constitutional requirements. Only those officials who have final policymaking authority may render the municipality liable under § 1983. [Plaintiff] concedes that [the police chief] was not the final policymaking authority in regard to the actions taken against [plaintiff]. Thus the actions of [the police chief] cannot impose liability on the city.") (internal citations omitted).

The Court agrees that the City itself is not a final policymaker, and the SAC's allegations and the Response do not demonstrate that the Co-Defendant Officers are a final policymaker. The "'Eleventh Circuit has interpreted *Monell's* policy or custom requirement to preclude § 1983 municipal liability for a subordinate official's decisions when the final policymaker delegates decisionmaking discretion to the subordinate, but retains the power to review the exercise of that discretion.' Accordingly, '[f]inal policymaking authority over a particular subject area does not vest in an official whose decisions in the area are subject to meaningful administrative review.' Conversely, final policymaking authority may vest in an official whose decisions in an

area *are not* subject to meaningful administrative review." *Willingham*, 638 F. App'x at 907 (internal citations omitted; emphasis in original). Merely because the SAC alleges that the Co-Defendant Officers had discretion to determine if someone meets the criteria for involuntary examination does not necessarily transform them into final policymakers. Count III, accordingly, fails to state a claim.

### D. Count IV

In Count IV, Plaintiff alleges that Defendant is liable for Co-Defendant Officers' violation of his Fourth Amendment and First Amendment rights because of Defendant's policy of "failing to train and or inadequate training its officers in knowing how to determine if a person they came in contact with meets the criteria for involuntary Baker Acting. Such policy . . . amounts to deliberate indifference to the constitutional rights of Plaintiff whom the officers came in contact with." ECF No. [49] at ¶ 53.

"[T]here are limited circumstances in which an allegation of a 'failure to train' can be the basis for liability under § 1983." *Canton*, 489 U.S. at 387. "[T]he inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *Id.* at 388. "Only where a municipality's failure to train its employees in a relevant respect evidences a 'deliberate indifference' to the rights of its inhabitants can such a shortcoming be properly thought of as a city 'policy or custom' that is actionable under § 1983." *Id.* at 389. In this respect, "'[m]unicipal liability under § 1983 attaches where—and only where—a deliberate choice to follow a course of action is made from among various alternatives' by city policymakers. Only where a failure to train reflects a 'deliberate' or 'conscious' choice by a municipality—a 'policy' . . . can a city be liable for such a failure under § 1983." *Id.* (internal citations omitted).

16

"Deliberate indifference can be established in two ways: by showing a widespread pattern of similar constitutional violations by untrained employees or by showing that the need for training was so obvious that a municipality's failure to train its employees would result in a constitutional violation." *Mingo v. City of Mobile, Ala.*, 592 F. App'x 793, 799-800 (11th Cir. 2014) (citing *Connick v. Thompson*, 563 U.S. 51, 131 S.Ct. 1350, 1360, 179 L.Ed.2d 417 (2011); *Gold,* 151 F.3d at 1350–52). "To establish a city's deliberate indifference, 'a plaintiff must present some evidence that the municipality knew of a need to train and/or supervise in a particular area and the municipality made a deliberate choice not to take any action.'" *Lewis v. City of W. Palm Beach, Fla.*, 561 F.3d 1288, 1293 (11th Cir. 2009) (quoting *Gold*, 151 F.3d at 1350). "[A] pattern of similar constitutional violations by untrained employees is ordinarily necessary to demonstrate deliberate indifference for purposes of failure to train." *Weiland v. Palm Beach Cty. Sheriff's Office*, 792 F.3d 1313, 1328 (11th Cir. 2015) (citation omitted).

This Court has previously found that a claim against a municipality for failure to train its officers was deficient where it does not set forth specific facts regarding "(1) the nature of any inadequate policies or procedures; (2) the factual basis – other than that this incident occurred – for concluding that the City's training is contrary to law; (3) the identity of any prior incidents which would have placed the City on notice of any policy or training deficiencies; and/or (4) the factual basis underlying assertions that the City employed incompetent officers." *Willis v. City of Coral Springs*, No. 16-CV-60959, 2016 WL 3747611, at *5 (S.D. Fla. July 13, 2016) (concluding that failure to train claim was insufficiently pled).

Here, Plaintiff alleges that Defendant failed to provide sufficient training for its officers to know "how to determine if a person they come in contact with meets the criteria for involuntary Baker Acting." ECF No. [49] at ¶ 53. In particular, he alleges as follows:

Prior to December 15, 2014 Defendant City of Lauderhill was aware that in order for their officers to have probable cause to arrest and involuntarily Baker [A]ct a person F.S.S. 394.463, involuntary examination, requires law enforcement to have a reason to believe a person has a mental illness that is causing them to refuse voluntary examination or not to be able to determine whether examination is necessary, that without treatment or care the person would likely suffer neglect or refuse to care for their self, that such would present a threat of substantial harm to themselves and that law enforcement must determine if there's a substantial likelihood that without care or treatment the person will cause serious bodily harm to himself or herself or other[s] in the near future evidenced by their re[c]ent behavior.

. . .

The City of Lauderhill failed to train and or adequately train its officers, including [Co-Defendant Officers], in [1] knowing what potential kinds of behaviors, actions and related mental illnesses justifies a reason to believe that a person is mentally ill and warrants an immediate mental examination (2) knowing what potential mental illness the person may have based on their actions or behavior and how that suspected mental illness will cause them to refuse voluntary mental examination or not be able to determine for their self whether examination is necessary (3) knowing what potential behavior, actions or mental illness, without car[e] or treatment, would likely cause the persons to suffer from neglect or refuses to care for their self and that such neglect would cause a real and present threat of substantial harm to their well being and its not apparent that such harm maybe avoided via the help of their family or friends (4) knowing what kind of potential behavior, actions or mental illness would present a substantial likelihood that without care or treatment to the person will cause serious bodily harm to their selves or others in the near future as evidence[d] by re[c]ent behavior.

The City of Lauderhill's police department's Field Training program for its officers regarding the mentally ill and Baker Act is grossly inadequate training regarding probable cause to determine if someone should be involuntarily Baker Acted. . . . The Lauderhill police department field training program for mentally ill/Baker Act No. IG-29 is the only training the City of Lauderhill provides its officers regarding the mentally ill and Baker Act. This training program [] does not give its officers any authority to determine if a person has a mental illness, as is required by the Baker Act, hence it does not provide its officers with any training as to how to determine if a person is mentally ill. The training program [] merely assumes that the officer is called for a mentally ill person. A determination regarding whether a person is mentally ill is the first requirement of the Baker Act. The training program goes on to give its officers full discretionary authority to determine if the person meets the criteria for involuntary examination but it does not train its officers how to make such discretionary determinations, such as what conduct, behavior or actions qualifies as a potential mental illness and no training regarding how to determine if the potential mental illness is causing the other Baker Act element in the persons, which the Baker Act requires to be determined from the mental illness prior to involuntary Baker Acting the person.

18

*Id.* at ¶¶ 55, 57-59. According to Defendant, Count IV fails because Plaintiff does not allege a "pattern of similar constitutional violations by untrained employees" but rather focuses solely on his December 15, 2014 involuntary commitment. ECF No. [53] at 7. Therefore, it submits that Plaintiff has not offered any factual basis, other than that this incident occurred, to conclude that the City's training is inadequate, that there were prior incidents that would have placed Defendant on notice of any policy or training deficiencies, or that Defendant employed incompetent officers. *Id.* at 7-8. The Court agrees. *See Willis*, 2016 WL 3747611, at *4-5.

As in *Willis*, "conspicuously absent from the [SAC] are fact allegations relating to anything other than the events of [December 15, 2014]. Such wholly unsupported conclusions that the City failed to establish appropriate police procedures and train police personnel accordingly, particularly in a state with a liberal public records law, are plainly insufficient." *Id.* at 5 (citing *Larosa v. City of Sweetwater*, 2014 WL 235449, at *2 (S.D. Fla. Jan. 22, 2014) (dismissing complaint which "offer[ed] no factual allegations other than [plaintiff's] own arrest and the circumstances surrounding that arrest" to substantiate allegations of a policy or custom); *Whitaker v. Miami-Dade Cnty.*, 126 F. Supp. 3d 1313, 1327-28 (S.D. Fla. 2015) (dismissing federal failure to train claims because "the facts alleged simply do not plausibly give rise to the inference that a final policymaker for the County made a 'decision not to train the officer[,]' or that it was obvious that their failure to do so would result in a constitutional deprivation")).

Additionally, Defendant argues that to the extent Plaintiff alleges that the City's Field Training Program Incident Guide No. IG-29 is "inadequate" because it allegedly "does not give its officers any authority to determine if a person has a mental illness, as is required by the [Baker] Act," his allegations are belied by Incident Guide No. IG-29 and a misstatement of the Baker Act itself. *See* ECF No. [53] at 8-9 (citing ECF No. [53-1]). Defendant adds that the Field Training

Program "provides discrete criteria for an involuntary Baker Act, which not only tracks the language of Section 394.463, Fla. Stat., but also provides concrete examples[.]" *Id.* at 9. In the Response, Plaintiff "concedes" that he "made a mistake" concerning his allegations of the Field Training Program, but that the "mistake" is cured by his additional allegations that point out what the Fielding Training Program "did not train its officers in." ECF No. [55] at 5-6. In reply, Defendant asserts that Plaintiff fails to "specifically address how the City's training policy is, in fact, inadequate based on the contents of the policy[.]" ECF No. [56] at 6.

At this stage, the Court need not decide the ultimate issue of whether Defendant's Field Training Program is legally inadequate. The SAC fails to allege sufficiently, as an alternative basis to set forth a failure to train claim, that the purported training deficiencies are "so obvious" that Defendant's failure to provide training in the manner Plaintiff seeks amounts to deliberate indifference. *See, e.g.*, *Canton*, 489 U.S. 378, 396–97 ("The claim in this case—that police officers were inadequately trained in diagnosing the symptoms of emotional illness—falls far short of the kind of 'obvious' need for training that would support a finding of deliberate indifference to constitutional rights on the part of the city. . . . [T]he diagnosis of mental illness is not one of the 'usual and recurring situations with which [the police] must deal.' The lack of training at issue here is not the kind of omission that can be characterized, in and of itself, as a 'deliberate indifference' to constitutional rights.") (O'Connor, J., concurring in part and dissenting in part; internal citations omitted); *Weiland*, 792 F.3d at 1329 (affirming dismissal of failure to train claim because although "evidence of previous incidents is not required to establish city policy if the need to train and supervise in a particular area is 'so obvious' that liability attaches for a single incident," the complaint failed to allege that "the need for specialized training in the constitutional restrictions on the use of force when dealing with mentally ill citizens is 'so obvious' that the failure to provide

such training amounts to deliberate indifference"). In this respect, although Plaintiff alleges that the City's training policy is flawed, the SAC does not explain why these deficiencies would have been so obvious under Fla. Stat. § 394.463 that Defendant's actions amount to deliberate indifference. Accordingly, Count IV fails at this time.

As a result of the foregoing analysis, dismissal of Counts III and IV is appropriate. However, because Defendant has not demonstrated that amendment is futile such that these claims can have no potential basis as a matter of law, dismissal shall be without prejudice.

## IV.    CONCLUSION

Accordingly, it is **ORDERED AND ADJUDGED** that the Motion, **ECF No. [53]**, is **GRANTED**.

**DONE AND ORDERED** in Chambers at Miami, Florida, on July 6, 2020.

**BETH BLOOM**
**UNITED STATES DISTRICT JUDGE**

Copies to:

Counsel of Record

Eric Watkins
7990 Hampton Blvd
Apt. 110
North Lauderdale, FL 33068
Email: kemet121671.ew@gmail.com